UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Blake T. S.,                                              Civ. No. 18-1029 (ECT/BRT)

      Plaintiff,

v.                                                        **REPORT AND RECOMMENDATION**

Nancy A. Berryhill,
Acting Commissioner of
Social Security,

      Defendant.

---

Stephanie M. Balmer, Esq., Falsani, Balmer, Peterson & Balmer, counsel for Plaintiff.

Marisa Silverman, Esq., Social Security Administration, counsel for Defendant.

---

BECKY R. THORSON, United States Magistrate Judge.

      Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").[1] Plaintiff was thirty years old on the date of the alleged onset of disability. (Tr. 23, 55.)[2] He alleges that he has been disabled since November 15, 2013, due to the following

---

[1]    This matter is before the Court on the parties' cross–motions for summary judgment, in accordance with D. Minn. LR 7.2(c)(1). (Doc. Nos. 14, 20.)

[2]    Throughout this Opinion and Order, the abbreviation "Tr." is used to reference the Administrative Record. (Doc. No. 13.)

conditions: chronic pain; 22q11.2 deletion syndrome/DiGeorge Syndrome[3]; chronic depressive disorder; obsessive compulsive disorder; learning disability; mental retardation; attention deficit disorder; degenerative joint disease of thoracic spine; degenerative disc disease of lumbar spine; chronic pain. (Tr. 187–204; 237.) After his applications were denied, and after a hearing at which Plaintiff,[4] a medical expert, and a vocational expert testified, the Administrative Law Judge ("ALJ") conducted the five-step sequential evaluation analysis[5] and denied Plaintiff's claim. *See* 20 C.F.R. § 404.1520(a)(4).

The ALJ found that Plaintiff had the following severe impairments at step two of the five-step evaluation process: "degenerative facet and disease with chronic low back pain, an organic mental disorder secondary to diGeorge Syndrome, a learning disorder in

---

[3]   "DiGeorge syndrome, more accurately known by a broader term—22q11.2 deletion syndrome—is a disorder caused when a small part of chromosome 22 is missing. This deletion results in the poor development of several body systems." https://www.mayoclinic.org/diseases-conditions/digeorge-syndrome/symptoms-causes/syc-20353543 (last visited June 12, 2019). "Medical problems commonly associated with 22q11.2 deletion syndrome include heart defects, poor immune system function, a cleft palate, complications related to low levels of calcium in the blood, and delayed development with behavioral and emotional problems." *Id.* "The number and severity of symptoms associated with 22q11.2 deletion syndrome vary. However, almost everyone with this syndrome needs treatment from specialists in a variety of fields." *Id.*

[4]   Plaintiff was thirty-three years old at the time of the hearing. (Tr. 40.)

[5]   *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." (quotations omitted)).

math, and attention deficit disorder[.]" (Tr. 13.) The ALJ did not find Plaintiff's depression to be a severe impairment. He noted that although Plaintiff "treats for depression with mood stabilizers and a low dose antidepressant," his "PHQ9 depression reports are in the minimal range," "[h]e testified that his depression medications have been unchanged for quite some time," and "[t]he impairment does not impose significant functional limitations." (Tr. 13.) At step three, the ALJ considered listing 12.02 (neurocognitive disorders) and listing 12.11 (neurodevelopmental disorders) with respect to Plaintiff's mental impairments, and concluded after considering the paragraph B criteria[6] that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 13–15.)

The ALJ then found that Plaintiff had the residual functional capacity ("RFC")[7] to perform light work, but only with the following limitations: "occasional bending; no use

---

[6]  The paragraph B criteria for listings 12.02 and 12.11 are the same. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(A)(2)(b). The "B" criteria requires either an extreme limitation in one or a marked limitation in two of the four areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00.

[7]  The ALJ's RFC determination is "an assessment of what [Plaintiff] can and cannot do, not what [s]he does and does not suffer from." *Mitchell v. Astrue*, 256 F. App'x 770, 772 (6th Cir. 2007); *see also* 20 C.F.R. § 404.1545(a)(1) (stating that a claimant's "residual functional capacity is the most [she] can still do despite [her] limitations"); *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (defining RFC as "the most a claimant can still do despite his or her physical or mental limitations") (quotations omitted). The ALJ is required to "determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of [her] limitations." *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015) (quotations omitted). "Because a claimant's RFC is a medical question, an
(Footnote Continued on Next Page)

3

of ladders or work by dangerous exposed hazardous moving machinery; unskilled routine repetitive work with no detailed or complex work activities." (Tr. 15.) Although the ALJ concluded at step four that Plaintiff cannot perform his past relevant work (Tr. 23),[8] at step five the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform—work that was not precluded by his RFC—such as "bench work assembly including small products assembly," "sub assembler," and "assembler of electrical accessories," and therefore he was found not disabled. (Tr. 24); *see* 20 C.F.R. § 404.1520(a)(4)(v).

In reviewing the ALJ's decision, the Court must "uphold the . . . denial of benefits . . . if the ALJ's decision is supported by substantial evidence in the record as a whole." *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (quotations omitted). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Id.* (quotations omitted). Courts "defer heavily to the findings and conclusions of the Social Security Administration." *Id.* (quoting *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010)). The Court "must consider evidence that both supports and detracts from the ALJ's decision, but we will not reverse an administrative decision simply because some evidence may support the opposite conclusion." *Perkins v.*

---

(Footnote Continued From Previous Page)
ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (quotations omitted).

[8] The vocational expert testified at Plaintiff's hearing that the demands of Plaintiff's past work as a mason helper and construction laborer exceeded his RFC. (Tr. 48.)

*Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (quotations omitted). If it is "possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Id.* (quotations omitted).

Plaintiff argues that there is not substantial evidence in the record as a whole to support the Commissioner's finding that Plaintiff was not disabled, and in doing so he raises several issues on appeal: (1) whether the ALJ considered evidence contained in Exhibit B5E; (2) whether the ALJ erred in concluding that Plaintiff's depression was not a severe impairment; (3) whether there was substantial evidence in the record supporting the ALJ's decision that Plaintiff did not satisfy the paragraph B criteria; (4) whether the ALJ erred in concluding Plaintiff's impairments did not equal a Listing when he did not conduct an equivalency analysis; (5) whether substantial evidence in the record supports Plaintiff's physical RFC found by the ALJ; (6) whether the ALJ properly weighed Dr. Kanoff's opinions; and (7) whether the ALJ properly weighed Dr. Ryden's opinions.

Because this Court concludes that remand is required for the ALJ to further develop the record to allow for a full equivalency analysis, and because by further developing the record, the ALJ could determine that the newly developed record affects his analysis at the other steps of the disability analysis, this Court refrains from addressing Plaintiff's other arguments raised on appeal and addresses only Plaintiff's equivalency argument at step three.

At step three of the disability analysis, medical equivalence can be determined if the claimant has an impairment that is described in the listing but he does not exhibit one or more of the findings specified in the particular listing or he exhibits all of the findings

5

but one or more of the findings is not as severe as specified in the particular listing. 20 C.F.R. §§ 404.1526(b)(1)(i), 416.926(b)(1)(i). "If the findings related to [the claimant's] impairment(s) are at least of equal medical significance to those of a listed impairment, we will find that [the claimant's impairment(s) or combination of impairments] is medically equivalent to [the analogous] listing." 20 C.F.R. § 404.1526(b)(2), (3). Here, the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. 13.) The ALJ considered listing 12.02 (neurocognitive disorders) and listing 12.11 (neurodevelopmental disorders) regarding Plaintiff's mental impairments. The ALJ did not discuss listing 12.05 (or specifically listing 12.05(B)[9]), nor did he address whether Plaintiff's impairments were medically

---

[9] At the time of the ALJ's decision, listing 12.05(B) provided as follows:

1. significantly subaverage general intellectual functioning evidenced by (a) or (b):
    a. full scale IQ score of 70 or below or
    b. full scale IQ score of 71-75 accompanied by a verbal or performance IQ score of 70 or below; and

2. significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation in two of the following areas:
    a. understand, remember, or apply information,
    b. interact with others,
    c. concentrate, persist, or maintain pace, or
    d. adapt or manage oneself; and

3. evidence about current intellectual and adaptive functioning demonstrates the conclusion that the disorder began prior to age 22.

(Footnote Continued on Next Page)

equal to listing 12.05, even though Plaintiff raised an equivalency argument based on his IQ in his pre-hearing brief. (Tr. 13–15, 549–50.) Plaintiff does not argue that his impairments met listing 12.05. Instead, Plaintiff argues that it was error for the ALJ to not conduct an equivalency analysis considering Plaintiff's full-scale IQ of 72[10] and his other additional severe impairments.

"If a claimant's impairments do not meet the severity of the listed impairment, the ALJ must still determine whether the severity of those impairments are medically equivalent to the listed impairment." *Cavanaugh-Stevenson v. Berryhill*, No. 16-CV-2122-LRR, 2017 WL 3951646, at *5 (N.D. Iowa Sept. 8, 2017). The medical equivalence regulation states:

> If you have a combination of impairments, no one of which meets a listing described in the Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter[,] . . . we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing.

20 C.F.R. § 416.926(b)(3).

The Social Security Administration has issued Program Operations Manual System ("POMS") guidelines relating to determining medical equivalence with mental disorders. *See* POMS DI 24515.056. "Although POMS guidelines do not have legal

---

(Footnote Continued From Previous Page)
20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(B).

[10]   The record reflects that Plaintiff's most recently recorded full-scale IQ was 71 upon testing in 2010. (Tr. 1617.)

force, and do not bind the Commissioner, [the Eighth Circuit Court of Appeals] has instructed that an ALJ should consider the POMS guidelines." *Cavanaugh-Stevenson*, 2017 WL 3951646, at *5 (quoting *Hesseltine v. Colvin*, 800 F.3d 461, 465 (8th Cir. 2015)). Relevant here, the POMS guidelines state:

> To determine an unlisted mental impairment is medically equivalent to a listed mental impairment, the unlisted mental impairment must fall within the parameters of the most closely analogous listed impairment. Then the findings of the unlisted mental disorder must be compared with the capsule definition and paragraph A and paragraph B (or C) criteria of the most closely analogous listing . . .
>
> . . . .
>
> To determine that multiple impairments are medically equivalent to a listed impairment, it must first be determined that the individual impairments fall within the parameters of an appropriate listed impairment. The combined findings of the multiple impairments must then be compared with the most closely analogous listed impairment.

POMS DI 24515.056(B)(2)–(3). With respect to listing 12.05(B), the POMS guidelines state that "[l]isting 12.05B introduces IQ scoring as a criterion and presents an impairment level in which inability to work is presumed on the basis of IQ scores alone." POMS DI 24515.056(D)(1)(b). It appears that this particular POMS guideline has not been updated after the 2016 revisions to listing 12.05.[11] The prior version of listing 12.05 included paragraph C and D criteria; the POMS guideline likewise provides guidance as

---

[11] The Social Security Administration revised the criteria in the Listings of Impairments used to evaluate claims involving mental disorders in 2016. Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138 (Sept. 26, 2016). In this appeal, the ALJ's decision is analyzed under the version of the Listing in effect when benefits were denied. *Id.* at n.1 ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions.").

to the prior paragraphs C and D. The current version of listing 12.05 only contains paragraphs A and B. However, some of the criteria contained in the prior paragraphs C and D that related to the claimant's adaptive function are now contained in paragraph B of 12.05 (in particular, those criteria that relate to the traditional paragraph B functional limitations). Therefore, the POMS guidelines as to the prior paragraphs C and D criteria are still instructive. With respect to prior paragraph C, the POMS guidelines state:

> Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g., 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

POMS DI 24515.056(D)(1)(c). In addition, with respect to prior paragraph D, the POMS guidelines state:

> This listing requires an IQ of 60 to 70 inclusive and a finding of at least two paragraph B functional limitations that are at a degree of limitation that satisfies the listing. Medical equivalence is possible in mental impairments with IQ's of 70 or above when the evaluation of either the test data or the functional manifestations warrant such a finding. For example, the MC may decide that the higher score is not a true reflection (e.g., practice effect) of the individual's intellectual endowment, or that the functional manifestations related to emotional deprivation or other causes may be greater than listing requirements (e.g., three paragraph B type manifestations may be at a level that satisfies the listing or that that two paragraph B type manifestations are at a level that satisfies the listing, but one of them is at the "extreme" level.)
>
> As was mentioned previously, there is a relatively close correlation between IQ test results and adaptive function when the cognitive deficit is the sole impairment. Thus, it would be very rare for people with IQ's above 75 and no other impairment to demonstrate functional limitations that

>satisfy the listing. If this occurs, there should be careful reevaluation of the data to determine if there is a coexisting mental disorder(s) that would explain the functional loss or, alternatively, whether the functional data has been correctly assessed.

POMS DI 24515.056(D)(1)(d).

Here, Plaintiff underwent WAIS-IV testing and was found to have a full-scale IQ of 71 in 2010, which is slightly higher than the 70 that is now required under the listing. (Tr. 1617–21.) In addition, there was at least some evidence that Plaintiff could meet the other requirements of listing 12.05(B). Plaintiff's prior employers (which were mostly friends of the family willing to accommodate Plaintiff and his functional limitations) consistently commented on his deficiencies relating to understanding, remembering, or applying information, as well as relating to Plaintiff's concentration, persistence, and pace. (Tr. 257, 260, 277, 476, 479–81, 519, 523, 529, 531.) His attention, concentration, and remembering deficits were also documented from an early age. (Tr. 358–60, 408–09, 1589–97, 1602.) He received special education services starting at the age of three, and he had Independent Education Programs ("IEPs") throughout his school years. (Tr. 244, 326–342, 500–517.) He dropped out of school after completing the 9th grade, and he failed at his one attempt at obtaining his GED. (Tr. 238, 244, 281, 290.) He eventually was diagnosed in 1999 with low intellectual functioning and found to "probably" meet criteria for Borderline Intellectual Functioning. (Tr. 363–67.) Plaintiff also has other neurologic dysfunction that may be caused from 22q11.2 deletion syndrome (aka, DiGeorge syndrome), which was confirmed in 2014. (Tr. 279; 290–92; 293–97; 868–70; 873–77.) Plaintiff's long-term primary care physician, Dr. John Ryden, opined in 2012

that Plaintiff met listing 12.04 and 12.05 (albeit under a prior version of listing 12.05) (Tr. 1474–75), and also later opined that Plaintiff was disabled due to his mental, cognitive, physical, and developmental limitations and requested further evaluation of Plaintiff's additional complicating neurologic dysfunction issues. (Tr. 758.)

The ALJ found that Plaintiff had other severe impairments: "degenerative facet and disease with chronic low back pain, an organic mental disorder secondary to diGeorge Syndrome, a learning disorder in math, and attention deficit disorder[.]" (Tr. 13.) Yet, even with this evidence of record, and even with his finding of additional impairments, the ALJ's decision did not mention the POMS guidelines for determining medical equivalence, nor did the ALJ attempt an equivalence analysis with respect to listing 12.05.[12] This case is analogous to *Shontos v. Barnhart*, 328 F.3d 418 (8th Cir.

---

[12]  Although true that an ALJ's articulation of the reasons why the claimant is not disabled at a later step in the sequential evaluation process may be sufficient rationale for the ALJ's finding about medical equivalence at step three (*see* SSR 17-2p, 2017 WL 3928306), here, the ALJ did not mention listing 12.05 anywhere later in his opinion, nor did his later RFC analysis indicate whether Plaintiff's mental limitations from his DiGeorge syndrome were fully determined and whether those limitations would affect the equivalency analysis regarding Plaintiff's IQ score of 71 or the paragraph B criteria. The ALJ acknowledged that Plaintiff has DiGeorge syndrome and stated that "the record shows few limiting physical manifestations." (Tr. 21.) However, his statements relating to Plaintiff's DiGeorge syndrome-related mental limitations were less clear:

> [T]he claimant has abnormal brain imaging and EEG studies and a diagnosis of DiGeorge syndrome confirmed by testing. Mental status findings indicate intellectual function in the borderline to low average range. Neuropsychological tests and observation document mild to moderate mental limitations. Although the claimant has diagnoses of depression and a baseline flat affect, the testing would *presumably* reflect limitation of all diagnoses, both severe and nonsevere, and would reflect the impact of chronic pain.

(Footnote Continued on Next Page)

2003), where the Eighth Circuit Court of Appeals found that an ALJ erred when there was "no evidence that the ALJ considered the POMS guidelines" despite evidence that Shontos suffered from "marked disabilities that would interfere with her ability to work." *Shontos*, 328 F.3d at 424–25, 427. Although debatable whether the evidence here shows "marked" or "moderate" disabilities, as in *Shontos*, the ALJ's decision here failed to discuss whether Plaintiff's mental limitations, including the IQ, either alone or in combination with Plaintiff's other limitations, would medically equal listing 12.05(B). *See also Cavanaugh-Stevenson*, 2017 WL 3951646, *5–6. This was error and requires remand. *See Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008) ("[R]emand is appropriate where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit this Court to conclude that substantial evidence supports the Commission's decision."). With no analysis provided by the ALJ regarding equivalency, this Court is not in a position to say whether there was sufficient evidence to support the ALJ's decision. *See Chunn v. Barnhart*, 397 F.3d 667, 672 (8th Cir. 2005) (remanding to the ALJ for further proceedings because it was "not clear from his decision that he even considered whether [claimant] met the requirements for listing 12.05C."); *see also Mahnke v. Berryhill*, 16-CV-60-LRR, 2017 WL 3388183, at *2 (N.D. Iowa Aug. 7, 2017) (affirming report and recommendation to remand case where the ALJ failed to address whether the claimant demonstrated a medical equivalency to listing 12.05C).

---

(Footnote Continued From Previous Page)

(Tr. 21 (emphasis added).)

The Commissioner argues that the record supports a conclusion that Plaintiff's impairments cannot equal the limitations under listing 12.05 because of Plaintiff's IQ scores and because of the ALJ's analysis as to the paragraph B criteria. An ALJ, however, is obligated to fully and fairly develop the record. *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008). Here, based on the borderline 2010 IQ scores and the other diagnosis of record, the ALJ needed to do more to develop the record to be able to fully consider the combined effects of Plaintiff's impairments. *See Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991) (holding that the ALJ did not adequately consider the combined effects of claimant's impairments when the ALJ failed to fully develop the record with respect to his findings). Plaintiff's IQ test was seven years old by the time of the ALJ's decision, and Plaintiff's DiGeorge syndrome was only recently discovered prior to Plaintiff's disability application. And although Dr. Eidson acknowledged Plaintiff's DiGeorge syndrome in her report following neurology testing in April 2014 and stated that Plaintiff's intellectual functioning fell within borderline to low average ranges with moderate to mild impairments, she also stated that "[g]iven the combination of borderline/low average intellectual functioning, reduced psychomotor speed, impaired processing speed, impaired complex attention, and history of depressive symptoms, it may be difficult for [Plaintiff] to perform successfully within the work setting." (Tr. 1150–54.) Approximately one month later, nurse practitioner Kelly Johnson noted after a neurology appointment with Plaintiff that they "[w]ill see him back in the fall after he has been to Colorado for a full workup regarding his DiGeorge syndrome." (Tr. 869.) The record does not reflect whether Plaintiff had the full workup regarding his DiGeorge

13

syndrome. Given the centrality of Plaintiff's IQ and the functional limitations that might be related to Plaintiff's DiGeorge syndrome and other diagnosis, the ALJ should further develop the record by ordering a new IQ test for Plaintiff, order additional testing to evaluate Plaintiff's functional limitations that relate to the criteria found in listing 12.05(B)(2), and seek updated opinions from treating physicians Dr. Ryden and Dr. Kanoff (and other treating physicians) after additional testing is done that relates to the current mental listing 12.05 criteria. Because the resulting evidence could impact the determination as to whether Plaintiff meets or equals a listing, this is of utmost importance.[13]

---

[13] This Court understands that the ALJ did conduct an analysis addressing the paragraph B criteria as it related to listing 12.02 (neurocognitive disorders) and listing 12.11 (neurodevelopmental disorders), and found substantial evidence supporting that the paragraph B criteria were not met. However, in light of the remand required to properly determine the equivalency analysis for listing 12.05, this Court will not presuppose whether, with the benefit of the newly developed record, there will be substantial evidence in the record to support finding, on remand, that the paragraph B criteria are met. Therefore, this Court does not make a finding as to whether to affirm the ALJ's paragraph B analysis at this time. The ALJ is at liberty to adjust his paragraph B analysis as he sees fit after the full development of the record. For the same reasons, this Court also does not affirm or reject the ALJ's step two analysis, nor does this Court address Plaintiff's other arguments made on appeal. On remand, after full development of the record, the ALJ may adjust any portion of his prior decision. He can more fully explain his consideration of Exhibit B5E, he should adjust his step two analysis if need be, he should reconsider his RFC analysis (both mental and physical limitations), and he should adjust the weight he gives to Plaintiff's treating physicians, Dr. Ryden (long-term primary care physician) and Dr. Kanoff (pediatric neurologist), and non-treating medical experts, if required after consideration of the developed record.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 14) be **GRANTED IN PART**;

2. Defendant's Motion for Summary Judgment (Doc. No. 20) be **DENIED**;

3. This matter be remanded to the Commissioner for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four), consistent with the above. On remand the ALJ should order a new IQ test for Plaintiff, order additional testing to evaluate Plaintiff's functional limitations, and seek updated opinions from treating physicians Dr. Ryden and Dr. Kanoff (and other treating physicians) after additional testing relating to the current mental listing 12.05 criteria. The ALJ should then reconsider his decision at all five steps of the sequential evaluation process.

4. Judgment be entered accordingly.

Date: June 19, 2019         *s/ Becky R. Thorson*_____
                            BECKY R. THORSON
                            United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "[a] party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14

days after being served with a copy" of the Report and Recommendation. A party may respond to those objections within fourteen (14) days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).